UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEXAS INSTRUMENTS INCORPORATED,                    :
                                                   :
                                    Plaintiff,     :
                                                   :          OPINION & ORDER
                    - against -                    :
                                                   :          06 Civ. 2305 (SHS) (RLE)
POWERCHIP SEMICONDUCTOR                             :
CORPORATION,                                       :
                                                   :
                                    Defendant.     :

RONALD L. ELLIS, United States Magistrate Judge:

## I.  INTRODUCTION

Plaintiff, Texas Instruments Incorporated ("Texas Instruments"), brought suit against

defendant, PowerChip Semiconductor Corporation ("PowerChip"), for breach of contract.  The

Honorable Sidney H. Stein referred the case to the undersigned for general pretrial matters.

Before the Court are Texas Instruments's four motions for sanctions against PowerChip in

connection with multiple discovery disputes that have arisen between the parties.  Texas

Instruments asks the Court to impose sanctions for conduct related to PowerChip's belated

production of certain responsive documents and its failure to produce other responsive

documents.  For the following reasons, Texas Instruments's motions are **GRANTED, in part,**

and **DENIED, in part**.

## II.  BACKGROUND

### A.  History of Discovery

On June 2, 2006, the scheduling order in the instant case established the deadline of

October 27, 2006, for the close of fact discovery.  On June 16, 2006, Texas Instruments served

its first document request on PowerChip and, on July 17, PowerChip responded.  In its response,

PowerChip objected to producing documents in unredacted form because of confidentiality

concerns.  On August 16, Texas Instruments sought the Court's intervention in the dispute, after

unsuccessfully attempting to reach a compromise with PowerChip.  On August 31, the Court

ordered PowerChip to produce unredacted documents.  On September 11, Texas Instruments

informed the Court that PowerChip would not be able to complete the production until the

second week of October.  Since discovery was set to close on October 27, Texas Instruments

sought a two month extension to account for the delay in PowerChip's production.  The request

was granted, and the discovery deadline was extended to December 29.  On October 17, the

parties submitted a revised scheduling order, taking into account the two month extension of fact

discovery.  The Court endorsed the proposed schedule, which set the following deadlines:

disclosure of expert testimony by February 5, 2007; disclosure of rebuttal expert testimony by

March 20, 2007; and close of expert discovery on April 16, 2007.

**B.  First Motion for Sanctions**

On December 18, 2006, Texas Instruments wrote this Court to request a conference to

discuss their intention to file a Rule 37 motion.  Texas Instruments alleged that there had been a

substantial failure of production on PowerChip's part, and wanted PowerChip precluded from

introducing evidence that was responsive to Texas Instruments's discovery requests but not

produced.  Letter from Barry Satine, December 18, 2006 ("12/18 Letter") at 1.  Texas

Instruments claimed that it had brought these deficiencies to the attention of PowerChip

throughout the course of discovery, and told PwerChip of its intention to seek preclusion of

documents not produced.  **Id**. at 1-2.  Texas Instruments also alleged that depositions of

PowerChip employees revealed that certain responsive documents had not yet been searched for, even though discovery was set to end shortly.  **Id**. at 2.  Specifically, Texas Instruments claimed three deficiencies: 1) invoices, purchase orders and other documents (collectively, "financial documents") requested by it had not been produced for two of the six years at issue, specifically 2000 and 2001; 2) one witness, a department head, testified during her deposition that she had not been instructed to look for relevant written documents and emails; and 3) the legal counsel had testified that she had not looked for a responsive document because her office was too messy.  **Id**.

PowerChip responded to Texas Instruments letter, arguing against discovery sanctions.  Letter from Andrew Aitken, December 22, 2006 ("12/22 Letter") at 4-5.  PowerChip asserted that it had been diligent and cooperative throughout the discovery process, noting that it had produced nearly 120,000 pages of documents.  **Id**. at 4.  With regard to the specific allegations, PowerChip stated that: 1) the financial documents had been overlooked, and would be produced by early January 2007; 2) the department head who testified had not been instructed to look for emails because there was no reason to think she would have relevant emails; and 3) the document referenced by the legal counsel could not be located at this time.  **Id**. at 4-5.

On January 12, 2007, the parties participated in a conference call with the Court to address Texas Instruments's motion for sanctions.  As to the financial records for years 2000 and 2001, the Court ruled that these documents would be considered timely, even though they were produced after the close of discovery, thereby denying Texas Instruments's request for preclusion.  The parties were also instructed to confer and attempt to define for the Court what specific documents would be responsive to each of Texas Instruments's discovery requests.  The

parties did confer, but were unable to identify with specificity what documents each document category would include, with one exception: they agreed that "manufacturing drawings and specifications" would include, *inter alia*, masks and layout databases, and that PowerChip had not produced masks or layout databases.  Letter from Barry Satine, January 30, 2007 ("1/30 Letter") at 1-2.  In the letter, PowerChip stated that it would not be introducing masks or layout databases into evidence at trial, and therefore would not be relying on these materials.  **Id**. at 7.

**C.  Second Motion for Sanctions**

On February 2, 2007, Texas Instruments again wrote the Court requesting a conference to discuss alleged discovery failures by PowerChip.  Letter from Barry Satine, February 2, 2007 ("2/2 Letter") at 1.  On August, 28, 2006, Texas Instruments had written PowerChip and had asked that it confirm Texas Instruments's request for the "SAP" reports for the years 2000 through 2006.  **Id**, Exh. 1 at 2.  On October 16, PowerChip confirmed that Texas Instruments had requested the SAP reports and agreed to produce them, reserving the right to object to further requests for data contained in the SAP database.  **Id**., Exh. 2 at 3.  On October 19, PowerChip produced a cd-rom, and, on October 31, Texas Instruments wrote to PowerChip asking if the cd-rom contained the SAP reports.  **Id**., Exh. 3 at 2.  On November 10, Texas Instruments wrote to PowerChip to alert it that there were no SAP reports for 2000 or 2001 on the previously produced cd-rom.  **Id**., Exh. 4.  On December 5, Texas Instruments began depositions of PowerChip employees in Taiwan, and, on December 10, again requested that PowerChip produce the SAP reports for 2000 and 2001.  **Id**., Exh. 5.  On December 11, PowerChip produced two cd-roms containing the data requested in an Excel spreadsheet format.  **Id**., Exh. 7.  A PowerChip witness, Charlene Lei, advised Texas Instruments that the data was not in a SAP report because

the SAP system was not established until 2002.  **Id**., Exh. 9.  On January 31, 2007, PowerChip produced a cd-rom to Texas Instruments, which it asserted contained the same information as in the spreadsheets previously produced, but in electronic format.  **Id**., Exh. 13.  Texas Instruments objected to this production because it said the information was different from that produced in the spreadsheets.  **Id**. at 4.  It claimed, moreover, that the production was untimely both because discovery had closed on December 29, 2006, and because Texas Instruments's expert would not be able to review this newly produced data given that expert reports were due on February 5, 2007.  **Id**. at 4-5.  In response to a request from the Court to clarify the relief sought, Texas Instruments submitted a second letter, on February 8, asking for an order pursuant to Rule 16(f) precluding PowerChip from relying on these SAP reports.  Texas Instruments claimed that the SAP reports, and the program which created them, were inadmissible hearsay, as well as noting that there were inconsistencies between the data in the spreadsheets and that in the SAP reports. Letter from Barry Satine, February 8, 2007 ("2/8 Plaintiff's Letter") at 1-2.

PowerChip responded to Texas Instrument's request for a conference in a letter dated February 8, 2007.  It claimed that it had discussed with Texas Instruments throughout the discovery period that the production of SAP reports for 2000 and 2001 would be more difficult than production for later years.  Letter from Andrew Aitken, February 8, 2007 ("2/8 Letter") at 1. In 2002, PowerChip had changed from a process in which employees manually reviewed data to determine if a royalty payment should be made, to one which was automated by a newly written computer program.  **Id**.  It had tried to create a computer program that could generate reports for 2000 and 2001, but this had proven more difficult than anticipated.  **Id**. at 1-2.  In order to produce the information as quickly as possible, PowerChip provided the spreadsheets during

depositions, and then supplemented with the SAP reports when they were finally completed.  **Id**.

**D.  Third Motion for Sanctions**

On February 21, Texas Instruments wrote the Court regarding its intent to seek further sanctions against PowerChip pursuant to Rules 16(f) and 37(d).  Letter from Barry Satine, February 21, 2007 ("2/21 Letter") at 1.  In this application, Texas Instruments raised two issues: 1) PowerChip's failure to produce certain business records and 2) its failure to comply with the discovery schedule by producing another group of documents after the close of fact discovery and the exchange of expert reports.  **Id**. at 1.  With regard to PowerChip's failure to produce the business records, Texas Instruments had served two interrogatories on PowerChip on November 22, 2006.  **Id**. at 2.  The first interrogatory asked: "For each individual report responsive to Plaintiff's Fourth Request for Production of Documents, identify by PSC Customer Identification Number each customer to whom a sale was made by PSC which resulted in a payment of a royalty by PSC, which royalty is included in an identified report."  **Id**., Exh. 1 at 2.  The second interrogatory asked: "For each individual report responsive to Plaintiff's Fourth Request for Production of Documents, identify by PSC Part Number each product sold by PSC which resulted in a payment of a royalty by PSC, which royalty is included in an identified report."  **Id**., Exh. 1 at 2.  Texas Instruments states that these interrogatories "were designed to identify which products sold to which PSC customers resulted in . . . PSC royalty payments to third parties," and therefore whether a customer was excluded from PowerChip's royalty obligations to Texas Instruments.  **Id**. at 2.

On December 22, 2006, PowerChip had served unverified responses to Texas Instruments's interrogatories.  **Id**., Exh. 3.  Power Chip objected to the first interrogatory as

overly broad and unduly burdensome, but stated that it would "produce SAP . . . reports sorted by relevant customer number, to the extent the SAP system provides an output to such query." **Id**. Power Chip also objected to the second interrogatory as overly broad and unduly burdensome, but stated that it would "produce SAP reports sorted by relevant customer number, customer name, product description, brand, grade, and material number, to the extent the SAP system provides an output to such query." **Id**. On December 26, Texas Instruments asked PowerChip to verify its response. **Id**., Exh. 4. In addition, it asked PowerChip to confirm that the SAP reports produced would include fields reflecting "which sales of which products are royalty bearing sales," and asked whether PowerChip would be responding to the interrogatories with respect to the years 2000 and 2001. **Id**. PowerChip responded on January 11, 2007, stating that it was working to provide verification and to "produce appropriate electronic reports pursuant to our Response to Interrogatory No. 4 and your letter of December 26, 2006." **Id**., Exh. 6. It provided verification of its interrogatory responses on January 31, but did not produce additional documents at that time. **Id**. at 4.

Texas Instruments states that it attempted to resolve the dispute with PowerChip, making several verbal requests for the documents and receiving verbal assurances from PowerChip that the documents were forthcoming. **Id**. On February 9, it wrote to PowerChip and asked whether the documents would be produced by the middle of the following week. **Id**., Exh. 8. It alerted PowerChip that it would seek judicial intervention if necessary. **Id**. PowerChip made a series of responses. **Id**. at 4. On February 12, PowerChip wrote that they were looking at the issue that day. **Id**., Exh. 9. On February 13, it wrote that it should have a response by the following day. **Id**., Exh. 10. On February 14, it wrote that it was preparing the materials in response to Texas

Instruments's interrogatories and that it expected to produce them "tomorrow midday." **Id**., Exh. 11.  On February 15, it called Texas Instruments to advise it that it was unable to produce the requested SAP reports. **Id**. at 4.  On February 16, it produced documents, which it identified as responsive to Texas Instruments's "final document requests and interrogatories." **Id**., Exh. 12. The documents produced did not include the requested SAP reports and PowerChip did not provide a supplemental interrogatory response identifying the documents as responsive to Texas Instruments's interrogatories. **Id**. at 4-5.

Texas Instruments also claims that PowerChip produced responsive documents in an untimely fashion. **Id**. at 5.  Fact discovery closed on December 29, 2006, but on both January 11 and February 16, 2007, PowerChip produced documents responsive to Texas Instruments's Fourth Request for Production. **Id**.  The production totaled approximately 235 documents, and no explanation for the late production was offered by PowerChip. **Id**.

Texas Instruments asks for three forms of relief. **Id**. at 6.  First, pursuant to Rule 37(b)(2)(A), it requests that certain facts be established for purposes of the action.[1] **Id**.  Second, it asks that the Court preclude PowerChip and its experts from relying upon the approximately 280 documents produced on January 11 and February 16, 2007, numbered PSC-B0012687 through PSC-B0012878. **Id**.  Third, it seeks reasonable expenses, including attorney's fees, for bringing the motion. **Id**.

---

[1]Those facts are: 1) "With respect to products sold by PSC to its non-licensor customers, PSC manufactured said products by employing the product designs of one or more of PSC's licensors.  2) "PSC paid royalties to one or more of its licensors for the use of product designs which were employed in the manufacture of products sold by PSC to its non-licensor customers."  And 3) "PSC did not pay royalties to TI on the sales of products sold by PSC to its non-licensor customers, where PSC paid royalties to one or more [of] its licensors for the use of product designs which were employed in the manufacture of said products."  2/21 Letter at 6.

PowerChip objects to Texas Instruments's requests on several grounds.  First, it asserts that Texas Instruments should have timely filed a motion to compel if it disagreed with PowerChip's objections to its discovery requests.  Letter from Andrew Aitken, March 5, 2007 ("3/5 Letter"), at 1.  Second, it claims that it never represented that there were additional SAP reports beyond those already produced.  **Id**.  Rather, it only agreed to produce reports responsive to Texas Instruments's requests if the SAP system was configured to do so.  **Id**. at 1-2. PowerChip states that it alerted Texas Instruments that its document request was based on an incorrect premise.  **Id**. at 2.  Moreover, it learned that the information requested could not be extracted from the SAP database without creating a new program, which "would impose an undue burden."  **Id**.  Finally, PowerChip claims that even if such a report were produced, it would be "substantially identical to the SAP reports that have been previously produced."  **Id**.

**E.  Fourth Motion for Sanctions**

On March 26, Texas Instruments wrote this Court for the fourth time seeking additional sanctions against PowerChip.  Letter from Barry Satine, March 26, 2007 ("3/26 Letter"), at 1.  In its letter, Texas Instruments claimed that, on March 21, PowerChip produced approximately 2,000 pages of responsive documents.  **Id**.  It alleged that PowerChip willfully withheld these documents from discovery, and only produced them because PowerChip's rebuttal experts needed to rely on them as a basis for PowerChip's defense.  **Id**.  These documents were produced one day after the parties exchanged expert rebuttal reports.  **Id**.  They fall into three categories: 1) "New documents with respect to Trademark, Trade Name, or Other Commercial Indicia;" 2) "New Documents with respect to Manufacturing Drawings and Specifications;" 3) and "New Documents with respect to Contracts."  **Id**. at 2, 5, 7.

With respect to the first category, Texas Instruments had served PowerChip with a document request on August 24, 2006 requesting "all documents concerning PSC's knowledge that LICENSED PRODUCTS sold by PSC to a third party were to be sold 'under the trademark, trade name, or other commercial indicia of such third party.'" **Id**. at 2 (*quoting* **id**., Exh. 1). PowerChip had objected on several grounds, but had agreed to produce "all documents concerning Defendants's knowledge that the use, lease, sale, offer for sale, importation, or other disposal of, such LICENSED products was under the trademark, trade name, or other commercial indicia of such third party." **Id**., Exh. 2.  Texas Instruments wrote to PowerChip on October 31, 2006, to notify it that documents responsive to this category had not been produced.  **Id**., Exh. 3. Texas Instruments also deposed PowerChip's designated 30(b)(6) witness on the topic.  **Id**., Exh. 4.  Texas Instruments asked the witness if PowerChip had kept a record of what mark would be placed on what product, and was told that there was a record kept and it should be in the sales department.  **Id**.  There was no further production on the part of PowerChip with regard to this category of documents.  **Id**. at 3.  On March 20, Texas Instruments received PowerChip's rebuttal expert reports, and two experts had relied on what Texas Instruments claims were responsive documents that were not produced.  **Id**. at 3-4.  These documents are: 1) a set of twelve photomicrographs of products bearing the commercial indicia of other PowerChip customers and 2) thirteen packaged chips marked with trademarks.  **Id**. at 4; **id**., Exhs. 6, 8.

With respect to the second category, Texas Instruments requested that PowerChip produce "all manufacturing drawings and specifications which were originated by, or on behalf of, [a specified] third party for the making of the LICENSED PRODUCTS."  **Id**. at 5 (*quoting* **id**., Exh. 1).  PowerChip produced the first page of "a number of multi-page mask tape-out

tooling forms." **Id**. at 5.  During the December 8, 2006 deposition of Mike T-C Hsu,

PowerChip's designated 30(b)(6) witness on the topic of manufacturing drawings and

specifications, Texas Instruments confirmed that only the first page of these tooling forms had

been produced.  **Id**., Exh. 12.  On December 10, it wrote to PowerChip about deficiencies in

production related to the depositions that had taken place.  **Id**, Exh. 14. With respect to the

incomplete tooling forms, Texas Instruments wrote, "Mr. Hsu also testified, as Powerchip's

30(b)(6) witness, that documents which Powerchip has produced to us are incomplete

documents.  (**internal cite to transcript omitted**)  We reiterate our position as to document

production."  **Id**., Exh. 14.  No further documents were produced in response to this request

during the discovery period.  **Id**. at 6.  On March 20, 2007, Texas Instruments received

PowerChip's expert rebuttal reports, one of which relied upon "the single pages of the multi-page

tooling forms produced" and stated that additional similar mask documents had been received.

**Id**. at 6; **id**., Exh. 6.  On March 21, Texas Instruments received approximately 1800 pages of new

documents consisting of complete multi-page tooling forms, including those that PowerChip had

previously produced the first page of, and mask tape out tooling forms and specifications.  **Id**. at

7; **id**., Exhs. 15, 16.

> With respect to the third category, Texas Instruments requested the production of:
>
> All contracts and agreements between Defendant and any third party entered into
> at any time, concerning the making of LICENSED PRODUCTS, either in finished
> or semifinished form for sale to any third party, at any time during the period
> January 1, 2000 through December 31, 2005, to use, to lease, to sell, to offer for
> sale, to import, or otherwise to dispose of, such LICENSED PRODUCTS under
> the trademark, trade name, or other commercial indicia of such third party in any
> instance where the manufacturing drawings and specifications are originated by,
> or on behalf of such third party.

**Id**., Exh. 1.  Texas Instruments received responsive documents from PowerChip throughout the discovery period, as well as after the close of discovery.  **Id**. at 7.  When it received PowerChip's expert rebuttal reports, one of the reports referenced the "Zentel agreement," which had recently become available.  **Id**., Exh. 6.  The following day, Texas Instruments received additional responsive documents not previously produced.  **Id**., at 7-8, **id**., Exhs. 17-25.  These documents had been relied on by two of PowerChip's experts for their opinions.  **Id**., Exhs. 6-7.  Texas Instruments asserts that PowerChip provided "no good faith explanation for [the] belated production."  **Id**. at 8.  In its motion, Texas Instruments asks for an order, pursuant to Rules 16(f), 37(b) and 37(c)(i), precluding PowerChip and its expert witnesses from "offering into evidence, relying upon or referencing in any manner" the material that was produced to it on March 21, 2007: 1) the twelve photomicrographs; 2) the thirteen packaged chips; 3) the mask documents marked PSC-D0000001 through PSC-D0001787; and 4) the contract documents marked PSC-E0000486 through PSC-E0000567.  **Id**. at 8.

PowerChip submitted a letter in opposition to Texas Instruments's request for sanctions. Letter from Andrew Aitken, April 2, 2007 ("4/2 Letter"), at 1.  In it, PowerChip denied any allegation of willful misconduct, and attributed any untimely production to Texas Instruments's "apparent tactical strategy to purposefully employ vague and ambiguous terms in its discovery requests."  **Id**. at 1.  It also raised objections specific to each set of the materials Texas Instruments argues should be precluded.  **Id**.  PowerChip argues that the photomicrographs should not be excluded on two grounds.  **Id**.  First, the photomicrographs are photographs that were taken after the close of discovery, and therefore were not in existence to be produced at the time discovery was being conducted.  **Id**. at 1-2.  Second, the materials are "immune from

discovery under the work product doctrine because the photographs were made at the request of PowerChip's attorneys." **Id**. at 2.  PowerChip states that, in attempting to find documents that would corroborate PowerChip's belief that its customers marked products with their own brand, "a number of actual sample . . . parts" and "some assembled products" were found.  **Id**. PowerChip's attorneys instructed that these products be examined under magnification to determine if markings had been made, and the photomicrographs are "the result of this investigation."  **Id**.  PowerChip objects to the preclusion of the thirteen packaged chips[2] because it did not "appreciate or consider that physical samples of assembled products would be responsive to [Texas Instruments's] document request seeking documents relating to the marking of products."  **Id**.  If Texas Instruments had wanted to inspect actual products, PowerChip argues, it should have "framed a discovery request in plain English seeking these materials."  **Id**. at 3. PowerChip also argues that there has been no prejudice to Texas Instruments because it is willing to allow "reasonable follow-up discovery" with respect to both the photomicrographs and packaged chips.  **Id**. at 2-3.

PowerChip maintains that the dispute over the mask tooling forms arises out of the parties' "fundamental disagreement over the meaning of the term 'manufacturing drawings and specifications' that is used in the License Agreement."  **Id**. at 3.  PowerChip objected to this discovery request as vague, ambiguous, potentially unduly broad and overly burdensome, and states that Texas Instruments provided no further clarification as to what particular documents it sought with its request.  **Id**. at 3, 5.  The Texas Instruments employee that negotiated the license

---

[2]PowerChip defines the thirteen packaged chips as "assembled products that had been made from chips or dies manufactured by PowerChip."  For the purpose of brevity, the Court will refer to these materials with the term used by Texas Instruments.

agreement testified that he understood the term "manufacturing drawings and specifications" to mean the masks used in the production process and the "layout database" used to create the masks. **Id**. at 3. As discussed above, PowerChip agreed that the term did include the masks and layout database, but did not agree to produce either because it claimed that it would have been unduly burdensome. **Id**. at 3-4. PowerChip did produce, as responsive to the request, "summary specifications and detailed product specifications that included some pin-layout drawings," but maintains that the mask tooling forms are not manufacturing drawings. **Id**. at 4-5. Instead, PowerChip argues that the mask tooling forms are "manufacturing instructions to the mask house that, in turn, uses the instructions in connection with the creation of masks." **Id**. at 5. Even if the materials were responsive, PowerChip asserts that preclusion is not warranted because of Texas Instruments's failure to provide further clarification in the face of PowerChip's objection of vague and ambiguous. **Id**. PowerChip states that Texas Instruments is sufficiently familiar with the "entire semiconductor manufacturing process" to have identified the materials it wanted with specificity. **Id**. Finally, PowerChip argues that Texas Instruments has not been prejudiced by the production of the mask tooling forms after the exchange of expert rebuttal reports. It argues that, when exemplary tooling forms were produced to "demonstrate and illustrate the type of materials that it maintained and kept . . . relating to the creation of the masks," Texas Instruments never followed up and asked that all mask tooling forms be produced. **Id**. Moreover, PowerChip argues, Texas Instruments's experts did not rely upon the pages of the tooling forms that were produced. **Id**

Finally, with regard to the contract documents, PowerChip maintains that it has produced the documents that it agreed to produce to Texas Instruments as soon as practicable. **Id**. at 6. Its

outside counsel states that it received the documents and forwarded them to PowerChip's expert on March 19, 2007.  **Id**. at 6 n. 6.  The documents were then assigned bates numbers and sent by overnight mail to Texas Instruments on March 20.  **Id**.  PowerChip's outside counsel has "not been able to ascertain an explanation for the delay in the production of these documents," but speculates that "the files must have been checked out during the initial collection process."  **Id**. at 6.  PowerChip also indicates that these contracts are from "minor" customers, and the "vast majority" of agreements had already been produced.  **Id**.

## F.  Pre-Motion Conference with the Court

On April 3, 2007, the parties appeared before the Court for a conference on Texas Instruments's four pending motions for sanctions.  The parties reiterated their stipulated agreement, memorialized in the joint letter to the Court, that PowerChip is precluded from relying on either the masks or the layout database at trial.  *See* 1/30 Letter at 7.  Texas Instruments agreed to wait until trial to raise any issue of secondary evidence arising out of these precluded materials.  The Court denied Texas Instrument's second motion for sanctions, in which it asked the Court to preclude PowerChip from relying on the SAP reports for years 2000 and 2001, because the discrepancies between the spreadsheet data and the SAP report data did not affect the legal issue of liability nor constitute a significant percentage of the alleged damages. The Court also ruled that the spreadsheets that PowerChip produced to Texas Instruments would be admissible.

On the issue of the business records that Texas Instruments alleged in its third motion that PowerChip had failed to produce, the Court indicated that there was no record on the difficulty of generating the report, or why it took PowerChip so long to inform Texas Instruments that it

would not be possible to fulfill this request.  The Court ordered PowerChip to submit an affidavit

on the burdensomeness of responding to Texas Instruments's discovery request by April 9, 2007

(extended by order, on request, to April 12), and withheld rulings on the remaining motions for

sanctions.

### G.  Affidavit on Burdensomeness

PowerChip submitted the declaration of Linda Tseng ("Tseng"), its Department Manager

of Sales Logistics, "regarding the efforts that would be required to create an SAP report in

response to [Texas Instruments's] interrogatory requests."  Letter from Andrew Aitken, April 12,

2007 at 1.  Tseng's declaration states that it "would be necessary to create a program to respond

to Texas Instruments's request," which would take more than one hundred hours to complete.

Declaration of Linda Tseng ("Tseng Decl.") ¶¶ 8, 22.  To complete the requested SAP reports

would take a total of seven to eight weeks, however, because the SAP reports would have to be

checked for quality assurance and, because PowerChip's information technology personnel is

limited, they would only be able to dedicate three to four hours per day to the project.  **Id**. ¶ 22.

On April 13, Texas Instruments submitted a response to PowerChip's affidavit.  In it,

Texas Instruments asserts that there are several inconsistencies between Tseng's declaration and

other statements and submissions by PowerChip.  Letter from Barry Satine, April 13, 2007, at 1.

It notes, for example, that Tseng's declaration states that PowerChip's SAP system does not track

royalty payments for licensors other than Texas Instruments, whereas deposition testimony stated

that every royalty payment has already been programed into SAP, and Tseng's declaration states

that PowerChip's standard practice has been to prepare royalty reports by manually reviewing

entries in its SAP data, whereas PowerChip has stated that identifying this information would be

unduly burdensome unless it could be done by a SAP program. **Id**. at 2. In response to Tseng's declaration that it would take approximately seven to eight weeks to respond to the discovery requests, Texas Instruments points out that, as of April 13, it had been sixteen weeks since PowerChip served its interrogatory responses. **Id**.

**H. Texas Instruments's Supplemental Submission and PowerChip's Response**

On April 20, 2007, Texas Instruments wrote this Court to provide supplemental information that had recently been developed through deposition testimony in support of its fourth motion for sanctions. Letter from Barry Satine, April 20, 2007 ("4/20 Letter"), at 1. With regard to the photomicrographs, Texas Instruments deposed PowerChip's expert, Dr. Peter S. Gwozdz, about the timing and source of the photomicrographs he had received. **Id**. at 1. He testified that he received the photomicrographs from PowerChip's counsel sometime between a week and a few days before he wrote the rebuttal report, and that he believed the materials were accompanied by a letter or an email. **Id**. at 2. No letter or email documenting this was produced. **Id**. Dr. Gwozdz was asked about an email between PowerChip and its outside counsel, Venerable, dated March 7, 2007, in which counsel stated that they only had representative photomicrographs in their possession. **Id**. at 3. Dr. Gwozdz did not know who had possession of the representative photomicrographs as of the date of the email, but he presumed it was someone at PowerChip's outside counsel. **Id**. He did not know how to determine if the photomicrographs were pictures of products that were manufactured during the relevant time period, and again referred Texas Instruments to PowerChip. **Id**. On the subject of the thirteen packaged chips, Dr. Gwozdz testifed that he received them from PowerChip's counsel "probably about a week before" his report and that he could not determine if they were

17

manufactured during the relevant time period without additional information from PowerChip. **Id**. at 3-4.  Texas Instruments argues that this testimony supports its contention that it has been prejudiced by PowerChip's belated production.  **Id**. at 3.

Dr. Gwozdz also testified that he received the mask tooling reports from PowerChip's counsel on the day he issued his rebuttal report, and that he had counsel's assistance in going though all the documents and confirming exactly what he had prior to signing his report.  **Id**. at 4. He testified that the documents were delivered by email.  **Id**. at 4-5.  Texas Instruments indicates that at the time of Dr. Gwozdz's testimony it had not received a copy, and that it has been prejudiced by the belated production.  **Id**. at 4-6.  On April 23, PowerChip responded to Texas Instruments's submission, arguing that Dr. Gwozdz's statements were "***fully consistent*** with . . . representations at oral argument."  Letter from Andrew Aitken, April 23, 2007 ("4/23 Letter"), at 1 (***emphasis in original***).

### III.  DISCUSSION

The imposition of sanctions is a matter committed to the sound discretion of the district court.  **Nat'l Hockey League v. Metro. Hockey Club,** 427 U.S. 639, 642 (1976); **Bobal v. Rensselaer Polytechnic Inst.,** 916 F.2d 759, 764 (2d Cir. 1990); **Neufeld v. Neufeld,** 172 F.R.D. 115, 118 (S.D.N.Y. 1997).  Under Rules 16 and 37, the Court may impose sanctions for discovery-related abuses.  FED. R. CIV. P. 16, 37.  The Court may also impose sanctions based on "its inherent power to manage its own affairs."  **Residential Funding Corp. v. Degeorge Fin. Corp.**, 306 F.3d 99, 106-07 (2d Cir. 2002).  However, a finding of bad faith is required in the latter context.  **DLC Mgmt. Corp. v. Town of Hyde Park**, 163 F.3d 124, 136 (2d Cir. 1998). Because there is not sufficient evidence of bad faith here, the Court relies on Rules 16 and 37 to

impose sanctions.

## A.  Rule 37: First Motion for Sanctions

"A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial . . . any  . . . information not so disclosed."  Fed. R. Civ. P. 37(c)(1).  Rule 26(e)(2) imposes upon parties a duty to seasonably amend prior responses to interrogatories, requests for production, or requests for admissions if "the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  FED. R. CIV. P. 26(e)(2).

In its first motion for sanctions, Texas Instruments asks the Court to order that PowerChip be precluded from introducing evidence that was responsive to Texas Instruments's discovery requests but not produced.  ***See*** 12/18 Letter at 1.  This Court has already denied Texas Instruments's specific request that PowerChip be precluded from relying on the financial information from years 2000 and 2001.  However, to the extent that PowerChip produced responsive documents after the close of fact discovery that had not been previously ruled on by this Court, either in prior rulings or this opinion, Texas Instruments's motion is **GRANTED**, and PowerChip is precluded from relying on such documents.

## B.  Second Motion for Sanctions

In its second motion for sanctions, Texas Instruments asks the Court to preclude PowerChip from relying on SAP reports generated for the years 2000 and 2001.  ***See*** 2/2 Letter; 2/8 Plaintiff's Letter.  This issue was ruled on at the April 3, 2007 pre-motion conference.  The

19

Court denied Texas Instrument's request for preclusion, and ruled that both the SAP reports for

2000 and 2001 and the spreadsheets that PowerChip produced to Texas Instruments would be

available as exhibits.

## C.  Rules 16(f) and 37(d): Third Motion for Sanctions

In its third motion, Texas Instruments moves for sanctions on two separate grounds.  ***See***

2/21 Letter at 1.

### 1.  Failure to Produce Requested Business Records

First, pursuant to Rule 37(d), it seeks sanctions for PowerChip's failure to produce certain

business records.  Rule 37(d) provides that, if a party fails

> to serve answers or objections to interrogatories submitted under Rule 33, after
> proper service of the interrogatories, . . . the court in which the action is pending
> on motion may make such orders in regard to the failure as are just, and among
> othere it may take any action authorized under subparagraphs (A), (B), and (C) of
> subdivision (b)(2) of this rule.

FED. R. CIV. P. 37(d).  Texas Instruments served two interrogatories on PowerChip requesting

information about royalty payments to third parties.  2/21 Letter, Exh. 1 at 2.  In its responses,

PowerChip objected to the interrogatories as overly broad and unduly burdensome, but agreed to

produce SAP reports responsive to them "to the extent the SAP system provides an output to

such query."  2/21 Letter, Exh. 3.  Texas Instruments followed up on these responses, requesting

confirmation that the SAP reports would show which sales were royalty bearing.  **Id**., Exh. 4.

PowerChip replied that they would produce appropriate electronic reports responsive to the

interrogatories."  **Id**., Exh. 6.  When no reports had been produced as of February 9, Texas

Instruments again inquired as to the status of the responses, but it was not until February 15 that

PowerChip informed Texas Instruments that it would not be able to produce the requested SAP

reports.  **Id**. at 4.

In objection to Texas Instruments's motion for sanctions, PowerChip makes several arguments.  First, PowerChip contends that Texas Instruments never filed a formal motion to compel any of the documents they now seek to preclude.  However, a formal motion is not required; a request for judicial intervention is sufficient.  ***See* JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. and Trade Servs., Inc.**, 2005 WL 1958361, at *14 n. 7 (S.D.N.Y. Aug. 16, 2005).  Here, Texas Instruments appealed to the Court on numerous instances to review PowerChip's failures of production.  These requests and the resulting Court involvement are equivalent to a formal motion to compel.  Second, PowerChip argues that it agreed to produce additional SAP reports only if the SAP system was configured to do so, which it found out it was not.  3/5 Letter at 1-2.  At the Court's request, PowerChip submitted an affidavit in support of the contention that it would be too burdensome to extract the requested information from the SAP database.  ***See*** Tseng Decl.  Finally, PowerChip objects on the ground that responsive reports would be substantially identical to ones already produced.  3/5 Letter at 2.

Texas Instruments properly served interrogatories on PowerChip, and PowerChip served responses indicating that two interrogatories would be answered through responsive SAP reports.  While PowerChip's response did include the disclaimer that it would produce the reports if the system was configured to conduct such a query, it was nearly three months after the interrogatories were served, and nearly two months after the close of fact discovery, that PowerChip informed Texas Instruments that such a query was not possible.  PowerChip does not appear to have made any substantive efforts to otherwise answer the interrogatories, and now rests their objections on undue burden grounds.  However, the claim of undue burden is not

sufficiently compelling.  PowerChip claims that it would take approximately seven to eight weeks to respond to the interrogatories, assuming that three to four hours per day are devoted to task.  As Texas Instruments points out, had PowerChip been diligent in responding, the interrogatories would be answered by now.  PowerChip made responding unduly burdensome by stating that such a response was possible, and then delaying investigation into whether the statement was correct.  In addition, the inconsistencies between Ms. Tseng's declaration and past statements by PowerChip, as highlighted by Texas Instruments's April 13 Letter, undercut the credibility of Ms. Tseng's assertions as to the true burdensomeness of the request.  As for PowerChip's statement that any reports produced would be "substantially similar" to those already produced, the Court declines to accept this unsupported assertion, particularly in the face of Texas Instruments's claims to the contrary at the April 3 conference.

Therefore, based on PowerChip's failure to provide responses to the interrogatories in question and this Court's determination that there is no undue burden in responding, sanctions are appropriate.  PowerChip is **HEREBY ORDERED** to produce SAP reports responsive to the interrogatories in question by **July 27, 2007**.  If PowerChip fails to do so, pursuant to Rule 37(b)(2)(A), the following facts will be taken as established: 1) "With respect to products sold by PSC to its non-licensor customers, PSC manufactured said products by employing the product designs of one or more of PSC's licensors;" 2) "PSC paid royalties to one or more of its licensors for the use of product designs which were employed in the manufacture of products sold by PSC to its non-licensor customers;" and 3) "PSC did not pay royalties to TI on the sales of products sold by PSC to its non-licensor customers, where PSC paid royalties to one or more [of] its licensors for the use of product designs which were employed in the manufacture of said

products."  2/21 Letter at 6.

### 2.  Failure to Comply with the Discovery Schedule

Second, pursuant to Rule 16(f), Texas Instruments seeks sanctions for PowerChip's

failure to comply with the discovery schedule by producing responsive documents in an untimely

fashion.  *See* 2/21 Letter at 1.  Rule 16(f) provides, in relevant part:

> If a party or party's attorney fails to obey a scheduling or pretrial order, . . . the judge,
> upon motion or the judge's own initiative, may make such orders with regard thereto
> as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C),
> (D). In lieu of or in addition to any other sanction, the judge shall require the party
> or the attorney representing the party or both to pay the reasonable expenses incurred
> because of any noncompliance with this rule, including attorney's fees, unless the
> judge finds that the noncompliance was substantially justified or that other
> circumstances make an award of expenses unjust.

FED. R. CIV. P. 16(f).  Approximately 280 responsive documents were produced by PowerChip

on January 11 and February 16, 2007, after the close of fact discovery.  2/21 Letter at 5.

PowerChip has not demonstrated that its failure to timely produce these documents was

harmless, nor have they demonstrated substantial justification for the failure.  The documents

produced on January 11 were thirteen days late, and PowerChip had requested an extension of

discovery, which was opposed by Texas Instruments and denied by the Court.  In addition, the

initial expert reports were not exchanged until February 5.  Because Texas Instruments had

sufficient time for review prior to the deadline for expert reports, the failure to produce is

presumed harmless.  However, with respect to the documents produced on February 16,

approximately seven weeks past the close of discovery and after the initial expert reports were

exchanged, the failure cannot be presumed harmless.  As with the failure to produce, PowerChip

contends that Texas Instruments never filed a formal motion to compel.  However, as stated

above, a request for judicial intervention, which Texas Instruments made on several occasions, is

sufficient.  Therefore, Texas Instruments's motion for sanctions pursuant to Rule 16(f) is

**GRANTED, in part,** and **DENIED, in part,** and PowerChip is precluded from relying upon, in

any manner, the documents produced on February 16, 2007.

### D.  Rules 16(f), 37(b) and 37(c)(1): Fourth Motion for Sanctions

Under Rule 37(b)(2), "[i]f a party . . . fails to obey an order to provide or permit

discovery, . . . the court in which the action is pending may make such orders in regard to the

failure as are just, and among others the following . . . [a]n order . . . prohibiting that party from

introducing designated matters into evidence . . ."  FED. R. CIV. P. 37(b)(2)(B).  Rule 16(f)

permits the same sanction of preclusion for a party's failure to obey a scheduling order, and Rule

37(c)(1) mandates preclusion when, without substantial justification, a party fails to disclose

information as required under the Rules, unless the failure is harmless.  FED. R. CIV. P. 16(f),

37(c)(1).

In its fourth motion, Texas Instruments requests that this Court preclude PowerChip and

its expert witnesses from "offering into evidence, relying upon or referencing in any manner" the

material that was produced to it on March 21, 2007: 1) the twelve photomicrographs; 2) the

thirteen packaged chips; 3) the mask documents marked PSC-D0000001 through PSC-

D0001787; and 4) the contract documents marked PSC-E0000486 through PSC-E0000567.  3/26

Letter at 8.  Whether or not sanctions are warranted depends on whether the materials produced

were responsive to discovery requests made by Texas Instruments.

#### 1.  Trademark, Trade Name, or other Commercial Indicia

Texas Instruments claims that the photomicrographs and packaged chips produced by

PowerChip on March 21, in conjunction with its expert rebuttal reports, are responsive to Texas Instruments's request for documents concerning PowerChip's knowledge that products sold to third parties were to be sold under the trademark, trade name, or other commercial indicia of the third party.  3/26 Letter at 2.  According to Texas Instruments, it received no documents in response to this request prior to March 21, even though PowerChip agreed to produce such documents and its designated 30(b)(6) witness on the subject testified that such documents existed.  **Id**., Exhs. 1, 2, 4.  With respect to the photomicrographs, PowerChip does not contest that they are responsive documents.  4/2 Letter at 1-2.  It claims that the photomicrographs were not subject to production because: 1) they were not in existence at the time of discovery and 2) were privileged under the work product doctrine.  **Id**.  PowerChip's arguments are unavailing.  Under Rule 37(c)(1), it had a duty to supplement its prior response once it learned the response was incomplete in some material respect.  FED. R. CIV. P. 26(e)(2), 37(c)(1).  To the extent that PowerChip maintains that the photomicrographs were subject to work product privilege, it had a duty to provide a privilege log.  Instead, PowerChip stated that responsive documents existed, failed to produce such documents, created responsive documents which it gave to its experts to rely on, and then produced the newly created documents to Texas Instruments after the exchange of expert rebuttal reports.  Under Rule 37(c)(1), this is sanctionable conduct.

As for the packaged chips, PowerChip claims that it did not view physical samples of assembled products as potentially responsive to Texas Instrument's documents requests, and argues that Texas Instruments could have requested to inspect actual products.  Similar to the photomicrographs, what PowerChip does not address is that it failed to respond to Texas Instruments's request for documents even though it asserted that responsive documents existed.

25

Texas Instruments cannot be faulted for its reasonable reliance on PowerChip's statements that responsive documents would be produced.  PowerChip cannot state that documents exist, fail to produce those documents, provide its experts with the requested information, in tangible as opposed to documentary form, and then blame Texas Instruments for not requesting to inspect the tangible items.

While PowerChip claims that it produced both the photomicrographs and packaged chips shortly after receiving them, its own expert testified that he received them sometime between a week and a few days prior to the exchange of rebuttal reports.  This would typically be an appropriate production time frame, if it were not for the crucial fact that PowerChip's experts had the materials prior to writing their rebuttal reports and Texas Instruments's experts did not.  Not only does PowerChip's experts' reliance on the materials make their assertion that the failure to produce was harmless untenable, Texas Instruments has demonstrated the prejudice it will suffer.  Therefore, under Rule 37(c)(1), preclusion is mandated.

### 2.  Manufacturing Drawings and Specifications

The parties vigorously dispute whether the mask tooling forms which PowerChip produced to Texas Instruments on March 21 are responsive to Texas Instruments's discovery request for all manufacturing drawings and specifications.  If they are responsive, PowerChip will be precluded from relying on the documents, unless it can demonstrate that its failure to produce them was harmless.  FED. R. CIV. P. 37(c)(1).  PowerChip did produce the first page of several mask tooling forms.  3/26 Letter at 5.  Texas Instruments established in deposition that additional pages were missing, and then requested that production of these forms be completed.  **Id**. at 6; **id**., Exh. 14.   PowerChip did not produce any further pages until more than three

months later, after the close of fact discovery and after the exchange of initial and rebuttal expert

reports.  **Id**. at 6.  Texas Instruments asserts that the production of the first pages of the forms

was in response to their request for manufacturing drawings and specifications, **id**. at 5, but

PowerChip claims that these documents were produced as exemplary documents to show Texas

Instruments what type of documents relating to the creation of the masks were kept.  4/2 Letter at

5.

      In a letter to the Court, PowerChip states that the dispute over whether the mask tooling

forms are responsive to Texas Instruments's request for manufacturing drawings and

specifications arises out of the parties' "fundamental disagreement over the meaning of the term

'manufacturing drawings and specifications' that is used in the License Agreement."  4/2 Letter

at 3.  PowerChip's position is that manufacturing drawings and specifications includes the actual

masks and the "layout database" used to create the masks, but not the mask tooling forms, which

it defines as "manufacturing instructions to the mask house that, in turn, uses the instructions in

connection with the creation of masks."  **Id**. at 3, 5.  However, PowerChip's expert witness, Dr.

Gwozdz, refers to the mask tooling forms as "mask documents," after stating that he is using the

term "mask" as meaning "manufacturing drawings and specifications."  3/26 Letter, Exh. 6 ¶¶ 8-

9, 53.  Dr. Gwozdz also relies on the mask tooling forms to support his position that certain

customers "supplied Masks or had Masks made on their behalf and thereby meet the

'manufacturing drawings and specifications' criterion of the exclusionary clause according to

TI's position."  **Id**. ¶¶ 33, 53.  Moreover, PowerChip's designated 30(b)(6) witness on the topic

of manufacturing drawings and specifications, Hsu, when asked about the mask tooling forms,

stated, "For the same manufacturing process we use the same form and basically it would

indicate that during the mask making process the type of material and other associated information that's being needed for that." **Id**., Exh. 12 at 23:33:46-23:34:08.  PowerChip's claim that the mask tooling forms are not responsive to Texas Instruments's request fails.

However, even if PowerChip genuinely believed that the mask tooling forms were not reponsive to Texas Instruments's request, it was clearly on notice that Texas Instruments considered the mask tooling forms to be responsive, and should have produced them.  After the deposition of Hsu, PowerChip's designated 30(b)(6) witness on the topic of manufacturing drawings and specifications, during which he confirmed that the mask tooling forms produced to Texas Instruments were incomplete, Texas Instruments wrote to PowerChip requesting that production be completed.  3/26 Letter, Exh. 14.  PowerChip accuses Texas Instruments of not identifying with specificity what materials it wanted, but Texas Instruments did just that when it requested complete copies of the mask tooling forms for which PowerChip had produced the first page.  4/2 Letter at 5.  PowerChip also claims that Texas Instruments never followed up on the initial production of the first pages of some mask tooling forms by asking that all mask tooling forms be produced.  **Id**.  However, it is not clear that Texas Instruments was made aware that these were "exemplary documents" of which there were more.  Moreover, when Texas Instruments requested full copies of the mask tooling forms that were produced, its request was ignored.  Finally, PowerChip argues that Texas Instruments was not prejudiced by the failure to produce because its experts did not rely on the pages of the mask tooling forms that were produced.  **Id**.  PowerChip can not successfully resist sanctions by arguing that Texas Instruments was not prejudiced because its experts declined to base opinions on incomplete documents.

As with the other materials produced on March 21, the timing of production, one day after the exchange of expert rebuttal reports, is disturbing, particularly in light of the numerous occasions on which Texas Instruments brought the issue of incomplete discovery to the attention of both PowerChip and the Court.  Since PowerChip itself states that the issue of manufacturing drawings and specifications is at the heart of this case, its failure to produce responsive documents is not harmless.  As such, preclusion is mandated under Rule 37(c)(1).

### 3.  Contracts and Agreements

The contract documents that PowerChip produced on March 21 were clearly responsive to Texas Instruments's request for the production of all contracts and agreements.  PowerChip does not dispute this, nor claim that their belated production arose out of Texas Instruments's ambiguous requests.  Instead, PowerChip claims that it produced the contracts as "soon as practicable."  4/2 Letter at 6.  PowerChip does not offer an explanation as to why it was not practicable to produce these contracts prior to the close of discovery, although it speculates that the files may have been "checked out" during the initial collection process.  **Id**.  However, the request for these documents was served on August 24, 2006, making the production nearly six months late.  3/26 Letter, Exh. 1.  The fact that PowerChip can offer nothing more than speculation as to the untimeliness of production is unreasonable.  Moreover, PowerChip's statement that it produced the contracts "as soon as practicable" is patently inaccurate.  4/2 Letter at 6.  PowerChip received the contracts on the morning of March 19, and was able to get them to its experts in time for inclusion in the rebuttal reports.  **Id**. at 6 n. 6.  Texas Instruments did not receive the contracts until March 21, after the expert rebuttal reports were completed.  **Id**.  PowerChip states that it had to assign the documents bates numbers and then send them via

overnight mail, but, considering the crucial time frame, it could have, for example, forwarded the contracts to Texas Instruments immediately and followed up with bates numbered copies.  It is impossible to ignore the fact that PowerChip's experts were able to use the documents for their rebuttal reports, but Texas Instruments's experts were not.  While PowerChip claims that these contracts were from "minor" customers and constitute a fraction of the contracts produced, **id**. at 6, the contracts were significant enough to be relied on by two of PowerChip's experts in their rebuttal reports.  3/26 Letter, Exhs. 6-7.  Therefore, the failure to produce them was not harmless, and PowerChip is subject to sanctions under Rule 37(c)(1).

Sanctions would also be appropriate under either Rule 16(f) or 37(b) for failure to obey the scheduling order.  Because Texas Instruments is only requesting preclusion of the untimely evidence and attorney's fees, both of which are available under Rule 37(c)(1), it is unnecessary to address additional grounds for sanctions.  Therefore, Texas Instruments's motion for sanctions is **GRANTED**, and PowerChip and its expert witnesses are precluded from relying upon, in any manner, the materials produced on March 21, 2007: 1) the twelve photomicrographs; 2) the thirteen packaged chips; 3) the mask documents marked PSC-D0000001 through PSC-D0001787; and 4) the contract documents marked PSC-E0000486 through PSC-E0000567.

## E.  Other Sanctions

Rules16(f), 37(c)(1) and 37(d) all permit the Court to require payment of reasonable costs, including attorney's fees, incurred by the prevailing party.  To this end, Texas Instruments shall file an affidavit on the number of hours required to file the motions for sanctions which were granted.

## IV. CONCLUSION

For the foregoing reasons, Texas Instruments's motions for sanctions are **GRANTED, in part**, and **DENIED, in part**. PowerChip is **HEREBY ORDERED** to produce SAP reports responsive to the interrogatories in question by **July 27 , 2007**.

**SO ORDERED this 24th day of May 2007**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

31